

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NATIONAL COUNCIL OF YOUNG )
MEN'S CHRISTIAN ASSOCIATIONS )
of THE UNITED STATES OF AMERICA, )
                                      )
             Plaintiff,       )
v.                                 )       Case No. 05 C 5034
                                      )
HUMAN KINETICS PUBLISHERS, INC., )       HONORABLE CHARLES R. NORGLE
                                      )
            Defendant.      )

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

      Before the court is Plaintiff's Motion for a Preliminary Injunction pursuant to its claims of trademark infringement under 15 U.S.C. §§ 1114 and 1125(a), dilution under § 1125(c), and unfair competition and deceptive trade practices. For the following reasons, Plaintiff's Motion for a Preliminary Injunction is granted.

## I. BACKGROUND[1]

### A. Facts

      Plaintiff National Council of Young Men's Christian Associations of the United States of America ("YMCA") is a non-profit corporation and the national resource center for 2,600 YMCAs in the United States. Together, these YMCA member associations comprise the largest non-profit community service organization in the country and work to meet health and social

---

[1]The court takes the undisputed facts from the parties' pleadings and notes disputed facts in the text.

1

service needs in 10,000 communities nationwide. YMCAs conduct an extensive variety of programs that seek to promote health, fitness, and sports, as well as family and community values. In connection with these programs, YMCA offers numerous instructional materials on physical well-being. YMCA's professional personnel, volunteer leaders, and participants use these materials pursuant to their involvement in YMCA activities. To provide certification for its professional staff, YMCA has established "YMCA University" and developed a Training Course Catalog from which staff members must complete thirty semester hours of YMCA courses.

For over 140 years, YMCA has used the YMCA designation (the "YMCA Mark") in connection with indicating organization membership and offering its instructional materials for sale. Through YMCA's website, the YMCA Mark is used in connection with promoting the organization's purpose, programs, goods, and services. See http://www.ymca.net (visited 3/14/06). The YMCA Mark is registered under two valid registrations, Reg. Nos. 668,795 and 1,549,218. YMCA also owns several other registrations of designations that contain the YMCA Mark.

Defendant Human Kinetics Publishers, Inc. ("HK") is a publishing company that produces literature in the field of health and physical fitness. HK offers a wide variety of products, including books, software, videos, and "distance education" courses. See http://www.humankinetics.com (visited 3/14/06). Since 1983, YMCA has licensed HK to develop and publish educational materials, including books, instructor guides, videos, software, and promotional materials (collectively, "YMCA Program Materials"). HK sells the YMCA Program Materials to YMCA member associations directly and through the YMCA Program Store Catalog.

Pursuant to the recent agreement between the parties, HK is the exclusive publisher and distributor of YMCA Program Materials. The agreement grants HK "a non-exclusive license to use the names 'Young Men's Christian Associations,' 'YMCA,' and variations thereof . . . solely in connection with the marketing and sale of [YMCA Program Materials]." The agreement further provides that "[a]ny use . . . of such names and/or marks in connection with specific new products . . . shall only be with the express approval of [YMCA]."

In March 2002, HK submitted a proposal to YMCA for the creation of an online education center that would offer expanded instructional resources for YMCA member associations and staff members. YMCA agreed to the proposal and HK subsequently hired a staff to begin development of curriculum for an online university. The parties, however, ultimately reached a logistical impasse, and in September 2004, terminated the endeavor.

In November 2004, YMCA learned that HK had started to promote "Triangle University," an "Education Center for the YMCA Movement." According to HK, its objective is to provide resource materials for YMCA personnel through a combination of on-line and classroom instruction. HK's curriculum includes such courses as, "Discover the YMCA," "Safety at the YMCA," and "Coaching YMCA Winners," and provides printed or downloadable study materials with the same titles. YMCA alleges that it never approved these products, and objects to HK's proposed use of the YMCA Mark in connection with Triangle University and its curriculum.

**B. Procedural History**

On November 4, 2005, YMCA filed its Amended Complaint alleging trademark infringement and dilution. On November 16, 2005 YMCA filed its Motion for a Preliminary

Injunction. On December 16, 2005, HK filed its Response to the Motion for Preliminary Injunction, and on January 6, 2006, YMCA filed its Reply. YMCA's Motion for a Preliminary Injunction is fully briefed and before the court.

## II. DISCUSSION

### A. Standard of Review

The purpose of preliminary injunctive relief is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." AM General Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 804 (7th Cir. 2002) (quoting Platinum Home Mort. Corp v. Platinum Fin. Group, Inc., 149 F.3d 722, 726 (7th Cir. 1998)). In order to obtain a preliminary injunction, the moving party must demonstrate: (1) a likelihood of success on the merits, (2) that it has no adequate remedy at law, and (3) will suffer irreparable harm if the injunction is denied. Kiel v. City of Kenosha, 236 F.3d 814, 815 (7th Cir. 2000); AM General Corp., 311 F.3d at 803. If the plaintiff fails to establish either of these elements, then the court's analysis "ends and the preliminary injunction should not be issued." Adams v. City of Chicago, 135 F.3d 1150, 1154 (7th Cir. 1998). A party "with no chance of success on the merits cannot attain a preliminary injunction." AM General Corp., 311 F.3d at 804.

If, however, the moving party clears both thresholds, "the court must next consider: (3) the irreparable harm the nonmovant will suffer if the injunction is granted balanced against the irreparable harm to the movant if relief is denied, and (4) the public interest, meaning the effect granting or denying the injunction will have on non-parties." Abbott Laboratories v. Mead Johnson & Co., 971 F.2d 6, 11–12 (7th Cir. 1992). In this phase of the analysis, "the court evaluates that likelihood of success, as the analysis turns to a 'sliding scale' under which a lesser

likelihood of success can be made sufficient by a greater predominance of the balance of harms." AM General Corp., 311 F.3d at 804; see Barbeque Marx, Inc. v. 551 Ogden, Inc., 235 F.3d 1041, 1044 (7th Cir. 2000). "The balancing of the imponderables involved in the decision whether to grant or deny a preliminary injunction is a task calling for a judgment based on the particulars of the individual case." Planned Parenthood of Wis. v. Doyle, 162 F.3d 463, 465 (7th Cir. 1990); Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1087 (7th Cir. 1988).

### B. YMCA's Claim

#### *1. Likelihood of Success on the Merits*

The primary issue in a motion for a preliminary injunction in an infringement claim is the movant's likelihood of success on the merits. See AM General Corp., 311 F.3d at 804; Platinum Home Mort. Corp. 149 F.3d at 726. A likelihood is established if the movant demonstrates that it has a "better than negligible" chance of succeeding on the merits. Id. at 733. In a trademark case, the plaintiff satisfies this element by showing: (1) that it has a protectable trademark, and (2) that defendants' misuse of the trademark creates a likelihood of confusion among consumers. See 15 U.S.C. § 1114(1)(a); 15 U.S.C. § 1125(a); Int'l Kennel Club of Chicago, 846 F.2d at 1084.[2] The same analysis applies to YMCA's unfair competition claim under the Lanham Act, see Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d 1111, 1115 (7th Cir. 1997), its unfair trade practice claims under the Illinois Uniform Deceptive Trade Practice Act, see D 56, Inc. v. Berry's Inc., 955 F. Supp. 908, 920 (N.D. Ill. 1997), and Illinois Consumer Fraud and Deceptive Practices Act, and unfair competition claim under Illinois common law, see AHP

---

[2]Because the court finds a better than negligible chance that YMCA could show a success on the merits on its trademark infringement claim, it is not necessary for the court to address YMCA's dilution claim. See Ty, Inc. v. The Jones Group, 237 F.3d 891 (7th Cir. 2001).

Subsidiary Holding Co. v. Stuart Hale Co., 1 F.3d 611, 619 (7th Cir. 1993). Therefore, with respect to determination of YMCA's likelihood of success on the merits, Counts II, IV-VI share the same outcome as Count I.

### a. *Likelihood of Confusion*

YMCA must demonstrate a likelihood of confusion between its trademark and HK's in order to show a likelihood of success on the merits. The factors used to determine whether a likelihood of confusion exists are: (1) similarity of the marks, (2) similarity of the products, (3) area and manner of concurrent use, (4) degree of care likely to be used by consumers, (5) strength of complaint's mark, (6) actual confusion, and (7) intent of alleged infringer to "palm off his product as that of another." Sullivan v. CBS Corp., 385 F.3d 772, 776 (7th Cir. 2004) (citing Promatek Indus. Ltd. v. Equitrac Corp., 300 F.3d 808, 812 (7th Cir. 2002)). These factors are not a mechanical checklist, and "[t]he proper weight given to each . . . will vary from case to case." Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 462 (7th Cir. 2000) (quoting Dorr-Oliver, Inc. v. Fluid-Quip, Inc., 94 F.3d 376, 381 (7th Cir. 1996)). The test is not whether the public would confuse the marks, but rather, whether the viewer of an allegedly infringing mark would be likely to associate the product with which it is connected with the source of products with which an earlier mark is connected. Nike, Inc. v. "Just Did It" Enterprises, 6 F.3d 1225, 1228–29 (7th Cir. 1993).

A review of these seven facts weighs in favor of find a likelihood of confusion that YMCA is the source of HK's materials that are at issue in this case. It is undisputed that HK's products make extensive use of the YMCA Mark. HK argues that its use of the YMCA designation is not a trademark use. HK claims that while it employs the YMCA name in the

titles of certain courses and texts that it offers, it utilizes a different presentation and layout. Where YMCA often uses its "Y" logo or "YMCA of the USA" identifier in close proximity to the YMCA name, HK does not. According to HK, these distinctions in form mitigate against consumer confusion. Additionally, HK points to the use of its own trademarks, Triangle University and Human Kinetics, as clearly identifying HK as the source of the materials and safeguarding against confusion.

Furthermore, "it is inappropriate to focus on minor stylistic differences in determining if confusion is likely, if the public does not encounter the two marks together." Sullivan, 385 F.3d at 777; see James Burrough Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 275 (7th Cir. 1976). Here, HK uses the YMCA Mark in its unauthorized publications exactly as it uses the mark in those that it is authorized to publish for the YMCA. The addition of the "Triangle" or "Human Kinetics" name or logo does not decrease confusion. Because HK is the exclusive publisher for YMCA materials, consumers may necessarily believe that the YMCA has approved, or otherwise authorized, HK's use of the YMCA Mark in the materials at issue. See Int'l Kennel Club of Chicago, 846 F.2d at 1088. As a result, it is possible that the public can "form an association between the mark and the source of that particular good." Sullivan, 385 F.3d at 777.

### *b. Similarity of Products*

The "similarity between products focuses on whether the buying public thinks or expects the products to come from the same source." Id. at 778. As YMCA asserts, it is entirely logical for a YMCA consumer to believe that YMCA is offering its products and course certifications via an online university, when in reality, HK is the company that offers these services. This is particularly true in this instance where HK informs YMCA consumers, who are required to

7

obtain certification in a particular number of training courses, that they may receive certificates upon completing the HK's Triangle University programs. Because the parties' products are of the kind that consumers may very well attribute to a single source, the similarity of the parties' products provides additional evidence of a likelihood of confusion.

### c. *Area and Manner of Concurrent Use*

The area and manner of concurrent use factor examines "whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." CAE, Inc. v. Clean Air Engineering, Inc., 267 F.3d 660, 681 (7th Cir. 2001) (quoting Forum Corp. of North America v. Forum Ltd., 903 F.2d 434, 442 (7th Cir. 1990)). To determine whether the area and manner of concurrent use existing between two marks is likely to create confusion, factors to consider include "the geographical area of distribution, whether there is evidence of direct competition between the relevant products . . . and whether the products are sold through the same 'marketing channel.'" Ty Inc. v. The Jones Group, Inc., 988, 999 (N.D. Ill. 2000).

Here, HK promotes, distributes, and sells both authorized and unauthorized materials, all of which bear the YMCA Mark. The YMCA Program Store website and the unauthorized Triangle University website are accessible from HK's main website.[3] Through the internet, HK uses the same marketing channel to serve the U.S. market of YMCA employees and volunteers, and does so in the same manner, by selling educational materials that are specific to the YMCA organization. The ease with which users can navigate through websites makes it more likely that

---

[3]Although HK asserts that the "the HK website does not link to the Triangle University website and Triangle University products are not offered on any websites . . . which offer YMCA approved products," upon review of the HK website, both Triangle University and the YMCA Program Store have respective links to their own sites.

8

consumers "will be confused as to the ownership of a website than traditional patrons of a brick-and-mortar store would be of a store's ownership." Trans Union LLC v. Credit Research, Inc., 142 F.Supp. 2d 1029, 1042 (N.D. Ill. 2001). As a result, HK's concurrent marketing efforts in cyberspace weigh in favor of YMCA's claim that there is a likelihood of confusion.

### *d. Degree of Consumer Care*

In order to properly assess the degree of consumer care, the court must consider both parties' potential consumers, "because even those customers who buy only [YMCA] products and services could be confused as to the source of those products and services." CAE, Inc., 267 F.3d at 682. In this instance, the relevant class of consumers includes YMCA staff, volunteers, and participants. The group members encompasses varying degrees of knowledge about YMCA materials and products, they are not susceptible to any broad generalizations regarding sophistication. "[W]hen a buyer class is mixed, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class." Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 293 (3d Cir. 1991). Arguably, some consumers will possess a sufficiently thorough understanding of the YMCA organization to understand that YMCA has not approved HK's Triangle University publications. However, less knowledgeable consumers may not understand this distinction. Even if HK is correct in asserting that YMCA directors are more sophisticated, the fact that HK was, for over twenty years, the publisher for authorized YMCA materials is likely to elicit a lesser degree of care when such YMCA directors purchase materials for their respective YMCAs.

9

### *e. Strength of the YMCA Mark*

"The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the products sold under the mark as emanating from a particular . . . source." Eli Lilly & Co., 233 F.3d at 464. YMCA has used the YMCA Mark for over 140 years to capture the spirit and mission that are central to the organization's purpose. As a result of extensive use, advertising and promotion, YMCA has developed valuable goodwill in the YMCA Mark, which is now famous and widely recognized. The YMCA Mark is strong and deserves protection.

### *f. Actual Confusion and Intent to Palm Off the Product as that of Another*

YMCA has not demonstrated actual confusion. The Triangle University courses have only been available for a short amount of time, and at this juncture, YMCA is not privy to the parties who have purchased them. As a result, this factor is neutral in the analysis.

Lastly, the court considers HK's intent in terms of the YMCA mark and Triangle University products. In order to find trademark infringement, proof of the infringer's fraudulent intent is not necessary. Ty, Inc., 98 F.Supp. 2d at 1001 (citing Ziebart Int'l Corp. v. After Market Assoc., 80 F.2d 220, 227 (7th Cir. 1986)); see Henri's Food Products Co. v. Kraft, 717 F.2d 352, 359 (7th Cir. 1983). HK argues that it does not try to palm off its unauthorized materials as YMCA products. Rather, HK contends that any prospective purchaser, upon cursory review of the materials and its disclaimers, would find that YMCA is not affiliated with Triangle University.

The manner, however, in which HK has promoted Triangle University to pertinent YMCA consumers reflects the contrary. In an introductory letter sent to all YMCA directors, HK

disclaims affiliation between YMCA and Triangle University, but expressly aligns itself with Triangle University courses. Moreover, in its leading text, DISCOVER THE YMCA, HK purports to speak on behalf of the YMCA and describes itself and YMCA as a collective entity. See Pl.'s Reply, Ex. B.

HK's name has been used in connection with YMCA materials for twenty years. By using the HK name in connection with Triangle University and its products, HK essentially negates the disclaimers and capitalizes on consumer familiarity with the relationship between HK and YMCA. Moreover, HK's reliance on disclaimers in the Triangle University materials wears thin where the infringement in issue is a verbatim copying of YMCA's name. See Int'l Kennel Club of Chicago, 846 F.2d at 1093. A plaintiff's "reputation and goodwill should not be rendered forever dependent on the effectiveness of fine print disclaimers often ignored by consumers." Id.

None of these factors alone is dispositive of the likelihood of confusion question, and "different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved." Id., at 1086. However, the relevant factors weigh in favor of YMCA in regard to HK's use of the YMCA Mark in connection with Triangle University materials. Based upon the evidence in the record, and the analysis of these factors, the court finds that YMCA has a better than negligible chance of showing likelihood of success on the merits. See Sullivan, 385 F.3d at 776; Anderson v. U.S.F. Logistics (IMC), Inc., 274 F.3d 470, 474-75 (7th Cir. 2001).

## *2. Inadequate Remedy and Irreparable Harm*

Next, YMCA must prove that there is an inadequate remedy at law and that it would suffer irreparable harm if a preliminary injunction does not issue. Promatek, 300 F.3d at 813. "It is well settled that injuries arising from Lanham Act violations are presumed to be irreparable, even if the plaintiff fails to demonstrate a business loss." Id., see also Abbott Labs, 971 F.2d at 16 (regarding the "well established presumption that injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss"). The readiness to find irreparable injury arises, in part, from the realization that "the most corrosive and irreparable harm to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods." Int'l Kennel Club of Chicago, 846 F.2d at 109 (quoting Processed Plastic Co. v. Warner Communications, 675 F.2d 852, 858 (7th Cir. 1982)).

HK claims that there is no irreparable injury because YMCA waited a year before filing the instant action and preliminary injunction. The Seventh Circuit, however, does "not support a general rule that irreparable injury cannot exist if the plaintiff delays in filing its motion for preliminary injunction." Ty, Inc., 98 F.Supp. 2d at 992 (citing Ideal Industries, Inc. v. Gardner Bender, 612 F.2d 1018, 1025 (7th Cir. 1979)). In fact, the "mere passage of time cannot constitute laches." Helene Curtis Industries, Inc. v. Church & Dwight Co., 560 F.2d 1325, 1334 (7th Cir. 1977). HK must have been lulled into a false sense of security or acted in reliance on the plaintiff's delay. See Chattanoga Manufacturing, Inc. v. Nike, Inc., 301 F.3d 789, 792-93 (7th Cir. 2002) ("For laches to apply in a trademark infringement case, the defendant must show that the plaintiff had knowledge of the defendant's use of . . . an allegedly infringing mark, [and] that the plaintiff inexcusably delayed in taking action . . . .").

12

The fact that YMCA sent a letter to HK making its objections clear and addressing the possibility of legal action should have placed HK on notice of a possible claim. YMCA bases its success and reputation upon its ability to control the use of the YMCA Mark, and its control over the use of the YMCA Mark is essential to preserving the value and integrity associated with the mark. As a result, the denial of preliminary injunction would cause YMCA to suffer irreparable harm and sustain incalculable monetary damages.

### *3. Balance of Harms*

The harm identified for YMCA must be balanced against the harm HK will suffer if a preliminary injunction is granted. If enjoined from using the YMCA Mark in connection with the promotion of Triangle University and its ancillary materials, HK will incur only minimal harm. However, "[o]ne entering a field already occupied by another has a duty to select a mark that will avoid confusion, one who fails in this duty cannot later complain that having to mend its ways will be too expensive." Processed Plastic Co., 675 F.2d at 859 (internal citations omitted). In this instance, HK had knowledge of the YMCA Mark and YMCA products, and was aware of YMCA's objection to its unauthorized use of the mark, yet continued to pursue this path. Any monetary loss HK might suffer is outweighed by the irreparable harm that YMCA would face if a preliminary injunction were not granted.

### *4. Public Interest*

In trademark infringement cases, "the relevant consideration [in determining whether the public interest will be disserved by the grant of an injunction] is the consumer's interests in not being deceived about the products they purchased." Int'l Kennel Club of Chicago, 846 F.2d at 1092 n.8. Here, the consumers encompass YMCA staff, volunteers and participants. As YMCA

properly asserts, this group will suffer if they purchase texts or enroll in courses pursuant to a mistaken belief that YMCA has approved such materials. In this instance, a preliminary injunction serves the public interest because enforcement of the trademark laws will prevent consumer confusion. Eli Lilly, 233 F.3d at 469; Promatek Industries, Inc., 300 F.3d at 814.

### III. CONCLUSION

For the foregoing reasons the court grants Plaintiff's Motion for a preliminary injunction and enjoins HK from all unauthorized uses of the YMCA trademark pending trial.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATED: 3/15/06